Good morning, Your Honors. May it please the Court, my name is Alan McAvigia and I'm appearing here today on behalf of the Petitioner. Now, as the Honors are aware, the main issue before this Court is whether the Immigration Judge and eventually the Board of Immigration Appeals' denial of the asylum and withholding, based upon adverse credibility findings, is supported by substantial evidence. As the Court is aware, this case is not governed by the REAL ID Act. Now, I don't want to waste the Court's time by repeating all the arguments that we already made in the briefs. I just want to take a little time to just emphasize and stress a couple of points that I think are very, very important here. And I want to just mention to the Court that I think it's painstakingly obvious how, from the very outset of this case, the Immigration Judge was predisposed to pull at any possible straw to undermine the Petitioner's credibility and deny his applications for release. Counsel, you know that's a really weak read. Let's talk a little bit about the fact that the Petitioner failed to mention the November 2003 bombing of his car in his application, which, at least he said, was the very reason why he departed Armenia. Why would he leave that out? That is a major point, is it not? It is, Judge, and that's a very good point. In fact, I was going to address that, Your Honor. And, again, if you read the transcript closely, Judge, this is, again, another misconstruction in selective reading of the record. If I may refer your attention to the very page where that note was made, and I know that the government makes a huge issue about this, quotation mark, exploding car incident, the respondent, if I may just have a second to find the page, this is found on page 109 of the administrative record. Now, if we read this transcript, that page starts with all these other incidents, the fact that he was detained, the fact that he was beaten, the fact that he was receiving threatening phone calls threatening his life, and then, I won't say in passing, Your Honor, but yes, and then he says, and once it was late, my car exploded in front of the factory. So, this is just one additional thing that happened to him, in addition to all these other events that he's testifying to, immediately before saying, and because it reached to the point that my life was in danger, I decided to leave Armenia. Now, you're right, if we just look at the line before his testimony that he decided to leave Armenia, sure, you would think that maybe it was the exploding car, but clearly, Your Honor, if you look at the transcript as a whole, the respondent was testifying for an hour, hour and a half, about a number of events, detentions, beatings, just threatening phone calls, his extortions by the government to basically put him out of business, so he can no longer afford to support the political party. This exploding car was not the pivotal event that the government would like the court to think that it is. Sure, Judge, I agree, Your Honor, maybe if it was in the application, it would have been a little more complete, but this is by no way akin to the pivotal fact, and in fact, the only factor in Alvaro Santos that was left out by the petitioner, if I'm sure Your Honors are aware, in Alvaro Santos, the petitioner came and set forth an application which basically on its face had no merit at all, had no basis for an asylum claim. He testifies, goes out, takes a break, and then comes in and says, hey, by the way, this incident happened, he talks about this really serious incident, and this is why I fled. In this case, Your Honors, even without this incident, the asylum application on its face, without the testimony, is worthy of an asylum grant. Talks about his political activities. There's letters, Your Honors, that the immigration judge completely ignored. There's letters, two letters from the political party that he was supporting, thanking him for his support. There's proxies confirming that he was in fact, I'm sorry, there's documents confirming that in fact he was a proxy during the elections supporting Mr. Dimitra, who was an opposition candidate. Why are we to ignore all of these documentary evidence, and all the consistent and detailed testimony, and if we're going to pick and straw the shirt, say, well, this is an exploiting card, this is a pivotal event, it's not a pivotal event. It's just an additional event that the respondent talks about. And yet what he said was the precipitating event that caused him to leave Armenia? No, Your Honor. That's why I was referring your attention to page 109 of the transcript. Just before that line, on that very page, he's talking about a whole bunch of other events. He's saying, at that time, I was receiving phone calls with threats to my life. But let me ask you this. His application was prepared by his cousin. She was not a lawyer. She was not a lawyer, Your Honor. Yeah. And did he have retained counsel? No, Your Honor, he did not. And we have a very important case in this field that says that an application under these circumstances should be read charitably. That's absolutely correct, Your Honor. Who decided that case? I'm sorry, Your Honor? Who decided that case? I did. Okay. I was going to say that was an excellent subpoena, Your Honor. This is a quiz. Hopefully that's not pointed against me. It's a light interview. Excuse me. So that's exactly your point, Your Honor. And so, like I said, Sotomayor and all the line of cases that support that notion clearly justify the Respondent's failure to set forth all the facts. I think the judge and the Board of Negation Appeals, for example, you know, this is a flagrant example of how they try to come up with inconsistency, where they talk and they make a huge point about how he said that he was violent, he mistreated, and then he honestly states during the testimony that he was not seriously injured. If he was trying to bolster his claim, he could have very easily said, yes, I was injured, they beat me up, I sustained a lot of injuries. He was very honest. He said that, no, I was not seriously injured. But I would submit, Your Honor, that in a democratic society, being detained for no reason at all, for your political beliefs, being beaten and then threatened and forced to sign a confession that whatever you said at a rally was a lie, would be akin to violent mistreatment. Violent mistreatment does not say violent beatings. If we're going to imply that that's what he meant, that's just purely, that's a textual example of speculation and conjecture, Your Honor. If we're going to resort to that, then every single asylum case should be denied. All right. Want to save a couple minutes? Sure, Judge. I would appreciate that. May it please the Court, my name is Chris Hammond and I represent the Attorney General of the United States. Seven years ago, the petitioner left the country of Armenia and sought asylum in the United States. The asylum hearing officer, the immigration law judge, and the Board of Immigration Appeals all listened carefully to the petitioner's application. They read the application for asylum. They listened to his testimony. And all three concluded that the petitioner's story lacked credibility. The only issue for this Court is whether the record compels the conclusion that the petitioner was credible. Under the highly deferential substantial evidence standard applicable to the denial of asylum, the immigration judge's credibility findings are upheld unless any reasonable adjudicator would be compelled to conclude the contrary. This being a pre-Real ID Act case, a single contradiction or inconsistency is sufficient to support an adverse credibility finding if it goes to the heart of the asylum claim. This Court has held that inconsistencies coupled with a single pivotal omission, as you discussed earlier, the bombing, which was an extraordinary event. And it was not mentioned in his original application. It was not mentioned after he had his interview with the asylum officer. And only at the very end of his hearing did he suddenly mention in passing this extraordinary event in which his car exploded. That alone would cause great concern and would prevent a reasonable adjudicator from being compelled to find that he was credible. There are many, many other omissions that were not in his original application that he attempted to... But we don't expect these folks to fill out complete applications, do we, covering every area and every subject. We know they don't. We know that a lot of these are filled out by notorios. And some of them just have people sign these things in blank. So, you know, you don't really believe the Attorney General of the United States believes what you're telling me, do you? We do not. You know that. You think Juan Osuna believes that these people sit down and fill these things out very carefully like they're going to take an LSAT exam? You know, they're people that are suffering. They're people that are scared. They don't know where to go half the time. Well, actually, when they're interviewed, they don't fill anything out. Sometimes they just sit there and talk to people, do they not, the asylum officer? Yes. Well, in this case... Well, sometimes, yeah, they do that. And the hearing officer asks them questions? It was his obligation to read his statement, have it read to him, if it's in another language, and swear that it was true. Now, we don't expect... Obviously, we wouldn't expect applicants to provide, and this Court's precedent is well settled, that you don't have to provide every single detail. Yeah, we said that. You don't have to provide details. He relates a whole series of problems and suffering and mistreatment here. Your Honor, the record will show that on at least three occasions, the petitioner says that he was beat, he was beaten. And there's only one such beating in his original application. Then he provides another beating episode in his supplemental statement. And then at the hearing, for the first time, he provided another beating that was shortly before he left for the country. So I think a reasonable adjudicator could think, well, you were beaten three times. Once, the first time, he was hit with a chair. He didn't actually put that in his original statement, so that was another omission. And then another occasion, he was hit with an ashtray. These are not minor beatings. And he neglected to mention two out of the three. So that, again, these are significant events. We wouldn't expect. Another troubling thing is that the petitioner says that he was a businessman, and he doesn't go into many details at all in his original application about his confrontation with the shareholder. Yeah, he was talking about the business he had some shareholder interest in. I think a reasonable adjudicator could wonder why a businessman would not be outraged that people are going after his business, that this is his livelihood, and he offers virtually no facts in his original application concerning these activities. He has a supplemental application, but he doesn't mention a key fact. He doesn't mention that his partner was offered $50,000 to buy out his shares. And that was a key fact. It was evidence of persecution, and that only came up in his asylum hearing. So it's just the overwhelming amount of omissions that give one pause in this case. One thing I want to explore here. I believe that all these things would give you a pause, but you have to look at this application. We don't know his sister prepared it. Well, that's actually the thing I want to go to. I can't expect him to, sitting there with her, to go into all these details. Sure, he had hearings, and a lot of things happened. He was living here for many years, and you recall things that occurred. So you're supposed to look at this charitably. As I understand it, contrary to what counsel for the petitioner said, he was represented by counsel, was he not? At some juncture, he was. I know that during the time he filled out the original application, he was not represented. But at the time of his hearing before the immigration judge, he was. Certainly. It says here Alan Aghabagian was counsel for him. Yes, that is correct. Do we have any indication that that is incorrect? No, he did have representation. Counsel made closing arguments, presented evidence before the immigration judge. So he was represented during that. So we're not talking about a situation here where somebody is entirely on their own, have no help, nobody's there. He's obviously able to counsel on appeal. He had counsel at the time of the IJ hearing. That's correct. Where's Aghabagian now? I was not aware of that. You were. I was. Throughout. OK. Throughout. Well, not at the initial state. I was just retained when he was in immigration court. You were at the immigration court. Not prior to that time. Go ahead. Your Honor, I would like to go to, since counsel did bring up, for those that I did bring up, the alleged bias on behalf of the immigration judge, we would like to reiterate our position that this was not properly exhausted, and therefore it is not properly before the court. I would agree that it is a strain to say that the immigration judge made some editorial comments concerning Ninth Circuit law that he may or may not be happy with, but in fact our interpretation is that he felt constrained by Ninth Circuit law and he thought that this was another alien that he would have to grant asylum to, but in fact the petitioner had so many omissions and some contradictions in his testimony that this was a different case and that was what the immigration judge was saying. So, again, the immigration judge denied the asylum claim because the petitioner failed to present credible evidence of past persecution as well as any credible evidence of a well-rounded fear of future prosecution. This court has upheld the denial of asylum where the immigration judge properly finds that the alien's evidence lacks credibility. I would like to point out a couple of other cases that don't necessarily, wouldn't change the result in this case, but may provide the court with some additional, just this year the court found in Ken V. Holder, that's again this past year, and that citation is 595 F3D 1050, that there the petitioner failed to mention a political demonstration. And again, they cited Alvarez-Santos and found that the petitioner was not credible. In Sobol v. Holder, again this year, that citation is 623 F3D 666, the court upheld an adverse credibility determination where the applicant failed to mention that his wife had been abducted on an occasion. So this court, there is no, this court's precedent holds that a single pivotal event that appears to be the catalyst for the individual's departure from the country, when that is omitted from the original asylum application and other subsequent materials, and suddenly appears at the hearing, that that is a red flag and that is too much that a reasonable adjudicator would not be compelled to find the petitioner was in fact credible. Are we done? Do you have any other questions? All right, thank you. I wish we had three hours to go over this case. I have so much to talk about. It's just, you know, counsel states that it almost seems like there's two separate statements that the petitioner refers to. But I think counsel is, in fact, confusing this record with another record. He comes here before your honors and with a straight face argues that we failed to raise a judge's predisposition to deny the claim, and therefore we're barred to raise an argument here. And yet it's really comical how the, if we fail to raise this issue, how the BIA dedicated a whole paragraph talking and undermining the judge's predisposition to deny the claim. We made our argument in our BIA brief. We made the argument in the 29th Circuit. The BIA spent a whole paragraph talking about this argument raised, and now the government comes before you and says that, yes, we never raised this argument. If I may be honest, I always, again, go over this over and over again, but I think one thing is extremely important. If I may respectfully refer your attention to page 46 of the admin record, the immigration judge from the outset comes, takes a bench and says, and I quote him, at first I thought that this case was just another sort of shameful example of how the respondents cater statements to avoid details that they might contradict in their testimony. His notion is basically that on the 9th Circuit, all the respondent has to do is come to court, recite the declaration, and you get a grant of asylum. And the BIA tries to undermine this just outrageous statement by saying, no, the judge was really not referring to the petitioner. It was just a general statement. He really had no preconceived notion to deny the claim. The counsel for the government argues that being a businessman, it's kind of funny how he never mentions the business. The petitioner in his asylum application, in his declaration, it's a three-page declaration, by the way. These declarations are usually a page, page and a half long. This was a three-page declaration that he submitted. On page 260 of the admin record, he dedicates a whole paragraph talking about his ownership of this factory, how he was extorted by the government officials because of his involvement in the political party. And then the government comes to him and says, it's kind of funny how the petitioner admits this. It's not admitted. It's just because it does not help the government's side. It does not support the arguments that the government is making. They choose to ignore all this evidence in the record. The fact that he was upset about the way he was treated, that was not his choice. That's why he's in the U.S. now, not in Armenia. Things don't work out as they work in the U.S. He was upset about it. That's why he got beaten up. That's why he was detained. That's why he fled Armenia. And again, if we're going to analogize this case with any case, I think this case is clearly analogous with this court's holding in Smolnyakova. The recent holding of this case that the government's counsel mentioned, the involvement in the political rally, that was the main event. The event that the petitioner was involved in forgot to mention in that case. In this case, there's a whole series of events that the petitioner was involved in that he does discuss in his declaration, during the testimony. There's no pivotal events whatsoever left out. If I may be honest, I really ask, because this is extremely important. The government has made a big issue about this, and you also made an issue about this. The fact that the exploding car was a pivotal event. Please look at page one of the admin record. He even says, and once it was late at night, my car exploded. It almost sounds like he's just saying this in passing. The reason that he left was because of all the other incidents, not because of this one car explosion. I think we've got your statement. Well, you're right. You're right. This is a very thick record. The IJ cited what he thought were a lot of inconsistencies. But every one of them, as far as I'm concerned, can be explained. For example, and I think it's terrible, we only allow ten minutes aside on a case involving somebody's life, and a long, thick file that we get. Thank you. So if my colleagues will indulge me, I'll just take a minute or two. But one of the inconsistencies that the IJ cites is that Gregorian signed a statement that indicated he was forced to give false information to the crowd. In his declaration, he states that he was detained and threatened for spreading untrue information in regards to the elections. And threats to his life, that he had threats to his life if he didn't sign documents while he was detained. He testified that his detention, to his detention, and states that his application that he was threatened. As a shareholder of the glove factory, the detail that mentioned in his application, now this was a detail that was just mentioned, a factory audited by the government, legally forced to pay 70,000, later 120,000. He states in his declaration that he and his factory were illegally harassed. And that was the main thrust of his argument there.  On September 11th, he states he was detained and spent two nights in detention. And then in his supplemental statement, we have that statement to explain that situation. And the car bomb explosion on October the 8th or the 9th, he didn't say that this occurred on the 8th or the 9th, but that he left to stay with relatives in Georgia on the 8th or the 9th. And the explosion was mentioned twice in his testimony and not as an afterthought. It was a point you were making. Exactly. So I have page and page and page of, after looking at this carefully and looking at it sympathetically. Just one last thing and I'll submit it on the record. Page 111 of the admin record, the petitioner specifically states that he obtained his visa on September 25th because he wanted to basically get away and just let things cool off a little bit. The car bombing occurred in early October, so after he already had obtained his visa. So now arguing that it was the car bombing that was the pivotal event that caused him to flee Armenia, and again, it's an outright, outright misstatement of the evidence. With that, I will submit it on the record. All right. Thank you. The matter is submitted. We'll get to the next case. This is Dari versus Holder.
judges: Holland, Pregerson, Smith M.